**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

TIFFANY LEA GIBSON,

     Plaintiff,

v.                                                                CIVIL ACTION NO. 2:20-cv-00559

KILOLO KIJAKAZI,[1] Acting
Commissioner of Social Security,

     Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

     Plaintiff Tiffany Lea Gibson ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on August 25, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's Plaintiff's Brief in Support of Complaint (ECF No. 15) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 16).

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d). *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 15), **GRANT** the Commissioner's request to affirm her decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 34 years old at the time of her alleged disability onset date and 37 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 279.)[2] She completed her GED and received vocational training as a certified nursing assistant. (*Id.* at 284.) Most recently, she worked as customer service agent at a ticket agency and a cashier at a gas station, and she has also been employed as a cashier at a fast-food restaurant, a cashier, sales associate, and stocker at a retail store, and a customer service agent at a phone company. (*Id.*) Claimant alleges that she became disabled on August 17, 2016, due to "Possible multiple sclerosis," bipolar disorder, anxiety, "Cannot handle stress," orthostatic hypotension, scoliosis, and "Beginning stages of arthritis in hip and back." (*Id.* at 283.)

Claimant protectively filed her applications for benefits on November 2, 2016. (*Id.* at 12, 255–68.) Her claims were initially denied on November 2, 2017, and again upon reconsideration on May 3, 2018. (*Id.* at 157–63, 167–80.) Thereafter, on June 19, 2018, Claimant filed a written request for hearing. (*Id.* at 181–82.) An administrative hearing was held before an ALJ on June 11, 2019, in Mount Hope, West Virginia, with the ALJ appearing from Charleston, West Virginia. (*Id.* at 38–74.) On July 25, 2019, the ALJ

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 14.

rendered an unfavorable decision.  (*Id*. at 9–37.)  Claimant then sought review of the ALJ's decision by the Appeals Council on September 23, 2019.  (*Id*. at 247–54.)  The Appeals Council denied her request for review on June 19, 2020, and the ALJ's decision became the final decision of the Commissioner on that date.  (*Id*. at 1–6.)

Claimant brought the present action on August 21, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 2.)  The Commissioner filed an Answer (ECF No. 13) and a transcript of the administrative proceedings (ECF No. 14). Claimant subsequently filed her Plaintiff's Brief in Support of Complaint. (ECF No. 15.) The Commissioner filed her Brief in Support of Defendant's Decision (ECF No. 16), and in response, Claimant filed her Plaintiff's Reply Brief in Support of Complaint (ECF No. 17).  As such, this matter is fully briefed and ready for resolution.

B.  *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

1.  *Evidence Related to Use of Walker*

Two days after her alleged onset date, on August 19, 2016, Claimant presented to a neurologist upon a referral from her primary care provider to be evaluated for multiple sclerosis.  (Tr. at 819.)  She reported "significant problems with memory and cognition," dizziness, "tingling and numbness in her face and scalp," and weakness in her extremities. (*Id*.)  A neurological examination was largely normal, although the neurologist noted that "she has poor effort throughout the testing presumably due to discomfort in her joints" and that she walked with a "somewhat bizarre" gait.  (*Id*. at 819–20.)  The neurologist believed that Claimant's symptoms were more likely caused by anxiety than by multiple

sclerosis, but he recommended further testing.  (*Id.* at 820.)  When that testing was "negative," the neurologist referred Claimant to another physician "for a second opinion." (*Id.* at 818.)  When Claimant presented to the second neurologist on October 3, 2016, he noted that there was "some mild unsteadiness" in her gait, but a physical examination was otherwise largely normal.  (*Id.* at 860.)  He believed that Claimant's symptoms could either "be representative of migraine headache with aura" or "may not be neurologic in origin."  (*Id.*)  He also stated that multiple sclerosis was "not excludable . . . but this is somewhat lower on my differential."  (*Id.*)  He recommended that Claimant try gabapentin and follow up in three to four months.  (*Id.*)

When she presented to her primary care provider on January 19, 2017, Claimant reported that she continued to experience "muscle weakness and tremors" and that "she falls 3-4 times per day but has never injured herself in these falls."  (*Id.* at 912.)  Upon physical examination, the physician observed that Claimant walked with a "wide-based" gait and had muscle weakness and "abnormal" sensation.  (*Id.* at 913.)  He ordered her a walker "to assist in gait and to prevent falling."  (*Id.*)

A January 27, 2017 brain scan revealed "[m]ild downward displacement of the cerebellar tonsils without evidence of hydrocephalus or peglike appearance," and imaging of Claimant's cervical spine revealed a "[c]ord syrinx which mildly expands the cord at the C7-T1 level."  (*Id.* at 921–22.)  After these findings, Claimant was diagnosed with a Chiari I malformation, and a neurosurgeon recommended a surgical decompression procedure. (*Id.* at 1013.)  The procedure was performed "without complication" on February 15, 2017, and Claimant "tolerated the procedure well."  (*Id.* at 1043.)  A post-operative brain scan showed "[e]xpected acute phase postoperative changes" but no hydrocephalus.  (*Id.* at 1058.)  At her follow-up appointment with her neurosurgeon on February 28, 2017,

Claimant reported that since her surgery she could walk using her walker, which she described as an "improvement from her immediate preoperative state," but she had "tremors in the legs and hand since surgery," and she continued "to have numbness in her hands as well as headaches." (*Id*. at 1091.) A physical examination was normal, except the physician's assistant noted that Claimant "ambulates with wheeled walker." (*Id*. at 1091–92.)

About a month later, on April 1, 2017, Claimant presented to the emergency room at the hospital where her surgery was performed and complained of "a yellow discharge" from her surgical wound and a headache that had not resolved with pain medication. (*Id*. at 1095.) A physical examination was normal. (*Id*. at 1098–99.) "Work-up . . . demonstrated a large pseudomeningocele and wound breakdown," so the neurosurgeon recommended placement of "a lumbar drain to facilitate healing of the incision and resolution of the pseudomeningocele." (*Id*. at 1110–11.) Claimant also underwent a ventriculoperitoneal shunt placement procedure on April 5, 2017, and she "tolerated surgery well and recovered without complication." (*Id*. at 1111.) She was discharged on April 7, 2017. (*Id*.) At a follow-up appointment four days later, Claimant continued to complain of "lack of stamina, generalized weakness, 'wobbly legs' with some near falls," "tremors in her legs with associated spasms," and "blurry vision with diplopia." (*Id*. at 1217.) Upon physical examination, the physician's assistant noted that Claimant's gait was "steady with wheeled walker," but the other findings were normal aside from "difficulty visualizing fundi" on an ophthalmic examination. (*Id*. at 1217–18.) The physician's assistant noted that Claimant "is recovering well." (*Id*. at 1218.)

On August 19, 2017, Claimant presented to the emergency department at a local hospital and complained of "[r]esidual [right-]sided weakness" that "is significantly

worsening" and a "verbal abnormality." (*Id.* at 1301.) Claimant was transferred to a different hospital so that she could be treated by her neurosurgeon. (*Id.* at 1300.) She was evaluated for a potential stroke, but it was determined that "her weakness was due to a non neurologic etiology." (*Id.* at 1330.) She was discharged home on August 21, 2017. (*Id.* at 1333.) A neurological examination upon discharge revealed "[n]on neurologic drift of the right arm" and "[p]ositive [H]oover's sign" but was otherwise normal. (*Id.* at 1332.)

When Claimant returned to her neurologist for the first time in nearly a year, on September 5, 2017, she continued to complain of numbness and weakness in her extremities, dizziness, "memory issues," and headaches. (*Id.* at 1550.) A physical examination was normal, and the neurologist noted that "it took some prompting to get her to give me full effort." (*Id.* at 1552.) He stated that Claimant "seems to be doing well from" her decompression surgery earlier that year and that "some of her symptoms may not be completely neurologic in nature." (*Id.* at 1556.) Several days later, on September 8, 2017, Claimant presented to her primary care provider, who observed upon physical examination, "She has reasonable muscle tone and she does walk. She thinks she needs a walker but I am not sure why." (*Id.* at 1686.)

Claimant next presented to her neurologist on March 5, 2018, and reported that she continued to suffer from migraine headaches, vision problems, "tingling from her upper spine to her hands and feet," and "numb spots in her head." (*Id.* at 2088.) She also related "that the surgery helped her ability to walk and after the surgery she was able to walk better but still uses a walker." (*Id.*) A physical examination was largely normal, and the neurologist observed that Claimant did not use a walker and "was able to stand [without] any sig[nificant] difficulty." (*Id.* at 2090.) He expressed "concerns that some of her symptoms are functional in nature." (*Id.* at 2092.)

About three months later, on June 8, 2018, Claimant presented to her neurosurgeon and reported that "[o]verall she has been doing fairly well" and that "[t]he pre-op head pressure has resolved," but she continued to complain of "spasms/tremors in the arms/legs" that her medication "helps," "intermittent nerve pain in her legs, intermittent blurry/double vision, dizziness and intermittent trouble concentrating and with confusion." (*Id.* at 2046.) A physical examination was normal. (*Id.* at 2046–47.) Shortly afterward, on July 3, 2018, Claimant returned to her neurologist and related that "she will stagger at times and will have to use the wall to catch herself sometimes" and "will forget certain things at times." (*Id.* at 2040.) She also reported that "the numbness and tingling in her hands and feet have worsened" and "[s]he still has the migraines." (*Id.*) She complained about her short-term memory. (*Id.*) A physical examination was normal, and the neurologist again observed that Claimant did not use a walker and "was able to stand [without] any sig[nificant] difficulty." (*Id.* at 2042.)

At her next appointment with her neurologist on October 22, 2018, Claimant reported that "she has fallen 8 times in past month and in walls and sideways." (*Id.* at 2028.) She also complained of "constant[]" headaches, "trouble with speech and comprehension," "facial tremors," and "tingling all over." (*Id.*) Upon physical examination, the neurologist observed that Claimant "had a tendency to drift her [right] arm" and had "4+/5" muscle strength in her upper extremities "bilaterally but there was give way weakness appreciated bilaterally and flexion was weaker than extension." (*Id.* at 2030.) Claimant also had "4+/5" muscle strength in her bilateral lower extremities and walked with a "[n]ormal and [n]arrow based gait without using a walker," but the neurologist noted that "[h]er left foot was slightly everted" and "she had a Hoover's sign" and that "she reported her left leg felt weaker." (*Id.*) The neurologist wrote, "I have talked

at length to her that I have concerns that part of her symptoms may not be neurologic in origin and at this time she will see her mental health provider tomorrow . . . ."  (*Id.* at 2033.)

When Claimant returned to her neurologist on April 22, 2019, she reported "that she still falls backwards, sideways, and her extremities hurt."  (*Id.* at 2094.)  Upon physical examination, the neurologist noted that Claimant had "normal [muscle] tone throughout all extremities" and "[n]o sig[nificant] tremor" or "drift in upper ext[remities]."  (*Id.* at 2096.)  She had "4+/5" muscle strength in her upper and lower extremities, but the neurologist wrote that he "had to prompt her to give full effort."  (*Id.*)  The neurologist also observed that "it took her multiple attempts to stand and when she did she walked [without] a walker and her movements were exaggerated but [she] would use the wall to stabilize."  (*Id.*)  He wrote, "My strongest impression is that this woman is presently seriously depressed and may benefit from adjunctive treatment such as supportive counseling, ideally with a clinician skilled at addressing issues of trauma as well as teaching supplemental behavioral strategies to counter low mood, pain and somatization issues."  (*Id.* at 2099.)

### 2.  *Evidence Related to Obesity*

Throughout the relevant period, Claimant's body mass index ("BMI") exceeded 40, the threshold for the "morbidly obese" category.  On August 19, 2016, two days after her alleged onset date, Claimant was recorded as being sixty-five inches tall and weighing 254 pounds, with a BMI of 42.26.  (*Id.* at 819.)  Ten months later, on June 19, 2017, Claimant weighed 271 pounds and 2 ounces, with a BMI of 45.1.  (*Id.* at 1326.)  At her consultative internal medicine examination on March 29, 2018, Claimant was recorded as being five feet, six inches tall and weighing 276 pounds.  (*Id.* at 1729.)  Shortly before the

administrative hearing in this case, on April 22, 2019, Claimant weighed 279 pounds and 5.2 ounces, with a BMI of 46.48.  (*Id.* at 2096.)

### 3.  *Vocational Expert Hearing Testimony*

During the administrative hearing, the ALJ heard testimony from a vocational expert ("VE").  (*Id.* at 69–73.)  After confirming that the VE had not spoken with the ALJ, Claimant, or her representative about her case prior to the hearing and that Claimant had no objections to the VE's qualifications, the ALJ asked the VE to classify Claimant's past work.  (*Id.* at 69.)  The VE stated that Claimant had previously worked as a retail cashier, a certified nursing assistant, a fast-food worker, and a self-service gas station cashier.  (*Id.* at 69–70.)

The ALJ then asked the VE to imagine a hypothetical individual "of the same age, education, and work history as the Claimant" who "would be capable of performing work at the sedentary exertional level" and who "could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel crouch, and crawl"; and "would need to avoid frequent exposure to extreme cold, heat, vibration, and workplace hazards such as moving machinery or unprotected heights."  (*Id.* at 70.)  She asked him whether the hypothetical individual could perform Claimant's past work, but he testified that the hypothetical individual could not.  (*Id.*)  She also asked him if the hypothetical individual could perform other work in the national economy, and he answered that the hypothetical individual would be capable of working as a toy and equipment assembler, a "grater/sorter," and an optical assembler.  (*Id.* at 70–71.)

The ALJ next asked the VE to imagine a hypothetical individual with the same limitations as the first hypothetical individual who was additionally "capable of simple, routine, repetitive work that was not at an assembly line or production pace," "only

occasional interaction with coworkers and crowds or the public," and could "tolerat[e] only a few changes in the work environment . . . define[d] as three to four per workday or work shift."  (*Id.* at 71.)  The VE testified that the second hypothetical individual could perform the three positions he had previously identified because "all three . . . are entry-level, unskilled, SVP 2 jobs" and "none of the positions are production-rate type jobs or piece-rate type jobs."  (*Id.*)

The ALJ also asked the VE if any jobs would be available for "an individual who would be off-task for 15% or more of a workday in a regular eight-hour workday, due to a need for additional breaks beyond the breaks that are ordinarily provided by an employer," and the VE answered in the negative.  (*Id.* at 71–72.)  She next asked the VE if work would be available for an individual with two or more days of unscheduled absences per month "and that could a [sic] combination of partial days or full days adding up to two days a month," and the VE again answered that no jobs would be available.  (*Id.* at 72.)

The ALJ concluded her questioning of the VE by asking him if his testimony was consistent with the *Dictionary of Occupational Titles*.  (*Id.*)  He answered, "It is consistent with a few exceptions.  The percentage of time off task and the absenteeism . . . are not covered by the [*Dictionary*].  And my testimony is based on the fact that I've been in the field of rehabilitation since 1995.  And in that capacity, I've performed extensive job analyses and job placement."  (*Id.*)

The ALJ then gave Claimant's representative an opportunity to question the VE.  (*Id.*)  Claimant's representative first asked the VE if work would be available for "a hypothetical individual the same age, education, and work experience as the Claimant who due to significant mental health impairments would have an inability to respond

appropriately to supervisors, coworkers, or usual work situations." (*Id*. at 72–73.) The VE responded that such limitations would preclude work. (*Id*. at 73.) Claimant's representative also asked the VE if work would be available for "a hypothetical individual the same age, education, and work experience as the Claimant who would have a inability [sic] to complete a normal workday [or] workweek without interruption from psychologically-based symptoms." (*Id*.) The VE again responded in the negative. (*Id*.)

### C.  *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits.  42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination.   20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).  The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es]

his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id*. §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20

C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a [VE] responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision. (Tr. at 14.) She further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (*Id.*) She found that Claimant's Chiari malformation repaired surgically, cervical and lumbar strain, morbid obesity, orthostatic hypertension, hernias, arthralgia, anxiety, bipolar disorder with schizotypal features, obsessive-compulsive disorder, depression, and borderline intellectual functioning constituted "severe" impairments. (*Id.* at 14–15.) However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 15– 21.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to

perform sedentary work . . . except [she] can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds" and "can occasionally balance, stoop, kneel, crouch, and crawl." (*Id.* at 21.) The ALJ further found that Claimant "must avoid frequent exposure to extreme cold, heat, vibration, and workplace hazards such as unprotected heights or moving machinery." (*Id.*) She also determined that Claimant can "perform[] simple, routine, repetitive work that are [sic] not at an assembly line or production rate pace," "can occasionally interact with coworkers, crowds, or the public," and "can tolerate few changes in the work environment defined as three to four changes in a work shift." (*Id.* at 21–22.)

The ALJ concluded that given the limitations imposed by Claimant's RFC, she was unable to perform her past relevant work. (*Id.* at 28.) She noted that Claimant is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.* at 28–29.) Because the ALJ determined that Claimant was unable to perform the full range of sedentary work, she enlisted a VE to aid in her finding that Claimant is capable of working as a toy assembler, grade sorter, and optical assembler. (*Id.* at 29.) As a result, the ALJ concluded that Claimant was not "under a disability . . . from August 17, 2016, through the date of this decision." (*Id.* at 30.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III. ANALYSIS

Claimant argues that the ALJ erred by failing to resolve an alleged conflict between the VE's hearing testimony and the *Dictionary of Occupational Titles*. (ECF No. 15 at 13–17.) She further asserts that the ALJ should have heard testimony from a medical expert at the administrative hearing. (*Id* at 17–19.) She asks this Court to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 19.) The Commissioner responds that Claimant has not shown a conflict exists between the VE's testimony and the *Dictionary of Occupational Titles* information for at least one of the representative jobs the ALJ found Claimant could perform. (ECF No. 16 at 5–7.) She also argues that the ALJ was not required to obtain a medical expert's opinion and that the ALJ adequately considered Claimant's use of a walker and her obesity. (*Id.* at 7–13.) Claimant replies that even if she can work as an optical assembler, the VE's hearing

testimony "is inherently unreliable due to the wrong and inconsistent information provided to the ALJ." (ECF No. 17 at 1–9.)

### 1. *VE Testimony*

Claimant contends that the ALJ should not have relied on the VE's testimony that an individual with her age, education, and experience who is precluded from working around hazards and at a production-rate pace can work as a toy assembler or a grade sorter. (*See* ECF No. 15 at 13–17.) "When, as in this case, an ALJ determines that a claimant's RFC prevents the claimant from performing [her] past work, the ALJ reaches step five of the review process," and "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant is capable of doing other work that exists in significant supply in the national economy." *Thomas v. Berryhill*, 916 F.3d 307, 313 (4th Cir. 2019). Generally, to meet this burden, "the Commissioner calls a VE to testify to whether a hypothetical person with the same limitations as the claimant would be able to perform any of the jobs listed in the [*Dictionary of Occupational Titles*]." *Id.* (citing *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015); SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)). Before relying on the VE's testimony, the ALJ must ask him if his testimony conflicts with the *Dictionary of Occupational Titles* and solicit an explanation if he answers that it does. *Pearson v. Colvin*, 810 F.3d 204, 208 (4th Cir. 2015) (quoting SSR 00-4p, 2000 WL 1898704, at *4). But even if the VE does not identify a conflict between her testimony and the *Dictionary of Occupational Titles*, the ALJ must nonetheless "independently . . . identify conflicts between the [VE's] testimony and the *Dictionary*" by "compar[ing] the express language of the *Dictionary* and the [VE's] testimony." *Id.* at 209.

There is no inconsistency between the VE's testimony in this case and the *Dictionary of Occupational Titles*.  An "apparent conflict" exists when "a VE's testimony 'seems to, but does not necessarily' conflict with the 'express language' of the [*Dictionary of Occupational Titles*]."  *Thomas*, 916 F.3d at 313 (quoting *Pearson*, 810 F.3d at 209).  Contrary to Claimant's assertion, the *Dictionary of Occupational Titles* specifies, consistent with the VE's testimony, that neither the toy assembler job nor the grade sorter job requires exposure to moving mechanical parts, and there is no mention of work at a production-rate pace.  U.S. Dep't of Labor, Dictionary of Occupational Titles 731.685-014, 1991 WL 679811 (toy assembler); *id*. 521.687-086, 1991 WL 674226 (grade sorter).  Although the undersigned agrees with Claimant that common sense would seem to dictate otherwise given the descriptions for these jobs, the undersigned **FINDS** that ultimately the VE's testimony accurately reflects their characteristics as set forth in the *Dictionary of Occupational Titles*.

Even if the toy assembler and grade sorter jobs were excluded from consideration, however, the ALJ nonetheless determined that Claimant could work as an optical assembler, with 103,000 positions in the national economy.  (Tr. at 29.)  "[I]dentification of even one occupation appropriate for Claimant fulfills the Commissioner's burden at the fifth step . . . so long as the occupation is available in significant numbers in the economy."  *Kennerly v. Colvin*, No. 2:15-cv-01540, 2015 WL 9672913, at *13 (S.D.W. Va. Dec. 8, 2015) (citing 20 C.F.R. §§ 404.1566, 416.966), *adopted by* 2016 WL 93867 (S.D.W. Va. Jan. 7, 2016).  A position with as few as 110 jobs in the regional economy has been found sufficient to satisfy the Commissioner's step-five burden.  *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979).  As such, the undersigned **FINDS** that even if the ALJ should not have relied on the VE's testimony about the toy assembler and grade sorter

18

jobs, she did not err by finding that work as an optical assembler would be available for Claimant.

### 2. *Medical Expert*

Claimant also argues that the ALJ should have consulted a medical expert when determining her RFC, particularly as it relates to her need to use a walker and her obesity. (ECF No. 15 at 17–19.)  But "the regulations do not contain a requirement for medical expert testimony at hearings and specifically state that the use of a medical expert is discretionary."  *Gorayeb v. Astrue*, 845 F. Supp. 2d 753, 760 (N.D.W. Va. 2011) (citing 20 C.F.R. §§ 404.1527(f)(1)(iii), 416.927(f)(1)(iii)).[3]    And a claimant's RFC "is an administrative assessment made by the [ALJ] based on all the relevant evidence in the case record," not medical expert testimony exclusively.  *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c); SSR 96-8p, 1196 WL 374184 (July 2, 1996)).  The undersigned thus **FINDS** that the ALJ did not err by electing not to consult a medical expert at the administrative hearing.

Claimant's suggestion that the ALJ needed medical expert testimony about her need to use a walker is also without merit.  Contrary to her assertion that the ALJ mentioned her walker only once in her written decision (ECF No. 15 at 18), the ALJ referred to the walker several times, and more importantly, she fully explained why she did not include the use of an assistive device in her RFC assessment.  Specifically, the ALJ reasoned that Claimant's "performance on physical examinations demonstrates [that she] can ambulate without an assistive device" and wrote that she "has noted the

---

[3] Even if the ALJ should have heard testimony from a medical expert pursuant to the directives in the *Hearings, Appeals, and Litigation Law* manual ("HALLEX") published by the Social Security Administration's Office of Disability Adjudication and Review, "HALLEX lacks the force of law and conveys no judicially enforceable rights to Claimant."  *Berry v. Saul*, No. 3:19-cv-00259, 2020 WL 1868769, at *12 (S.D.W. Va. Mar. 30, 2020), *adopted by* 2020 WL 1865849 (S.D.W. Va. Apr. 14, 2020).

inconsistencies with performance on these examinations, including suboptimal effort and requiring multiple prompts to offer effort." (Tr. at 28.) Indeed, the ALJ thoroughly recounted this evidence in her review of the medical evidence of record. (*Id.* at 22–25.) The undersigned **FINDS** that the ALJ's reasons for omitting restrictions related to the walker in her RFC assessment are more than apparent and are supported by substantial evidence.

Finally, Claimant implies that the ALJ should have obtained medical expert testimony to determine whether her obesity is medically equivalent to a Listing. (ECF No. 15 at 19.) As an initial matter, to the extent she argues that the ALJ erred by relying on the state-agency medical consultants' determinations at the initial and reconsideration levels of review that no Listing was met or medically equaled simply because they did not have access to the entire record, she is mistaken. (*Id.*) This is true in every case, and the ALJ's only obligation is to consider the state-agency consultants' opinions in the context of the record as a whole. *Cochran v. Saul*, No. 5:20-cv-00472, 2021 WL 3504657, at *8 (S.D.W. Va. July 7, 2021), *adopted by* 2021 WL 3501258 (S.D.W. Va. Aug. 9, 2021). She clearly did so here, giving their opinions "great weight" but determining that they "slightly over-estimate the limitations imposed by the claimant's impairments" and citing to evidence dated both before and after their review of Claimant's case. (Tr. at 26–27.)

But ultimately it is Claimant's burden to demonstrate that her condition meets or medically equals a particular Listing. *Holley v. Saul*, No. 3:20-cv-00534, 2021 WL 1821719, at *7 (S.D.W. Va. Apr. 21, 2021) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)), *adopted by* 2021 WL 1819701 (S.D.W. Va. May 6, 2021). As the ALJ pointed out, "there is no listing for obesity." (Tr. at 16.) Claimant has not identified the Listing that her obesity, in conjunction with some other impairment, medically equals. (ECF No. 15

at 19.)  Accordingly, the undersigned **FINDS** that the ALJ properly concluded, even without medical expert testimony, that Claimant's obesity is not medically equal to a Listing.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 15), **GRANT** the Commissioner's request to affirm her decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable John T. Copenhaver, Jr., Senior United States District Judge.   Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.   Extension of this time period may be granted for good cause shown.   Copies of any objections shall be served on opposing parties and provided to Judge Copenhaver.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.   28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: September 2, 2021

Dwane L. Tinsley
United States Magistrate Judge